UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
CHARLES E. GORE,                          :    03 Civ. 9442 (KMK) (JCF)
                                          :
              Plaintiff,                   :         REPORT AND
                                          :         RECOMMENDATION
     - against -                           :
                                          :
THE RBA GROUP, Inc. and HAIDER            :
ENGINEERING,                              :
                                          :
              Defendants.      :
- - - - - - - - - - - - - - - - - - - -:
THE HONORABLE KENNETH M. KARAS, U.S.D.J.:

     The  plaintiff,  Charles  Gore,  brings  this  employment

discrimination action against The RBA Group, Inc. ("RBA") and

Haider Engineering ("Haider"), pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq; 42

U.S.C. § 1981 ("Section 1981"); the New York State Human Rights

Law, N.Y. Exec. Law § 290 et seq.; and the New York City Human

Rights Law, N.Y.C. Admin. Code § 8-101 et seq.  He alleges that

during his tenure at RBA and Haider, he suffered discrimination due

to a racially hostile work environment.[1]  RBA now moves for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.[2]  For the reasons that follow, I recommend that RBA's

motion be denied.

---

     [1] The plaintiff originally asserted disparate treatment and
retaliation claims, but in the course of briefing the instant
motion he has expressly withdrawn those claims. (Plaintiff Charles
E. Gore's Brief in Opposition to Defendant RBA Groups Motion for
Summary Judgment ("Pl. Memo.") at 2 n.4).

     [2] It appears that Haider has not answered the complaint and is
in default.

Background

Unless otherwise stated, the following facts are either uncontested or construed most favorable to the plaintiff. Mr. Gore, a black man, was hired as an inspector by RBA in November 1999. (Second Amended Complaint ("2nd Am. Compl."), ¶¶ 2, 14). RBA is a consulting, engineering, and architectural planning firm that is engaged in the business of design, planning, construction, and inspection. (Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def. Rule 56.1 Statement"), ¶ 3; Deposition of Anthony Mavis ("Mavis Dep."), excerpts attached as Exh. E to Certification of Joseph B. Fiorenzo dated April 27, 2005 ("Fiorenzo Cert.") and as Exh. 5 to Affirmation of Christopher P. Edelson dated June 2, 2005 ("Edelson Aff."), at 7). Mr. Gore's duties at RBA included insuring highway safety and compliance with state and city specifications on construction projects. (Affidavit of Charles Gore dated May 31, 1990 ("Gore Aff."), attached as Exh. 1 to Edelson Aff., at 1).

In May 2001, RBA supervisor Tony Vero assigned Mr. Gore to work with Jack Giarraputo on an intersection restoration project on Long Island known as the Route 231 Project. (Deposition of Julius "Jack" Giarraputo ("Giarraputo Dep."), attached as Exh. G to Fiorenzo Cert. and as Exh. 4 to Edelson Aff., at 11-12; Deposition of Syed Haider ("Haider Dep."), attached as Exh. D to Fiorenzo Cert., at 20-21; Gore Aff. at 1). Mr. Vero told the plaintiff that RBA needed him to work on the Route 231 project but that the State of New York would not permit RBA to put another employee on its

payroll for that purpose; so instead, Mr. Gore would be placed on Haider's payroll, and upon completion of the project, he would again be paid by RBA. (Plaintiff's Rule 56.1 Statement of Disputed Material Facts ("Pl. Statement of Disputed Facts"), ¶ 4; Gore Aff. at 2). Mr. Gore was then hired by Haider Engineering. (Deposition of Charles Gore dated Jan. 25, 2005 ("Gore Dep. I"), excerpts attached as Exh. H to Fiorenzo Cert. and as Exh. 2 to Edelson Aff., at 246; Haider Dep. at 20-22). From 2001 to 2003, Mr. Gore was paid by Haider for his work on the Route 231 Project as reflected by his W-2 forms. (Gore Dep. I at 246-47; Haider Dep. at 20; Copies of 2001, 2002, and 2003 W-2 Forms, attached as Exh. U to Fiorenzo Cert.). The defendant alleges that Mr. Gore resigned from RBA in May 2001 and then worked as an employee of Haider from May 2001 to March 2003. (Def. Rule 56.1 Statement, ¶ 21; Removal from Payroll Form dated May 2, 2001, attached as Exh. S to Fiorenzo Cert.). The plaintiff alleges that he was employed jointly by both RBA and Haider during this period. (Pl. Statement of Disputed Facts, ¶ 1).

While working on the Route 231 project, Mr. Gore received assignments from and was under the authority of Mr. Giarraputo and other RBA employees (Giarraputo Dep. at 12-16); Deposition of Charles Gore dated February 15, 2005 ("Gore Dep. II"), excerpts attached as Exh. J to Fiorenzo Cert. and as Exh. 3 to Edelson Cert.), and he was the only employee who was paid by Haider. (Giarraputo Dep. at 12-13, Gore Dep. II at 288). And, while Haider purportedly retained the authority to set the terms and conditions

of Mr. Gore's employment (Haider Dep. at 23), Mr. Haider rarely
came to the Route 231 project job site and did not actually give
Mr. Gore instructions regarding his job.  (Gore Dep. II at 289).

The plaintiff has alleged that while he was working on the
Route 231 project, Mr. Giarraputo made racially disparaging remarks
toward him on a weekly basis, calling him a "nigger," a "monkey,"
a "fat dumb black ass," and "a piece of shit," saying that he
"smelled like Harlem," and making derogatory remarks about Martin
Luther King.  (Gore Dep. I at 184-87; Gore Dep. II at 20-22; 281-
82).  Nephtali "Nat" Davila, another RBA employee on the Route 231
project, has confirmed that Mr. Giarraputo referred to Mr. Gore as
a "nigger," called Everett Palmer, another African-American, a
"nigger," and said that Mr. Gore's office "smell[ed] like Harlem."
(Affidavit of Nephtali "Nat" Davila ("Davila Aff."), attached as
Exh. 7 to Edelson Aff., at 1).

The plaintiff also testified that Mr. Giarraputo made racially
disparaging remarks challenging his ability to do his job.  For
example, he overheard Mr. Giarraputo say to another RBA employee on
the Route 231 project: "Who the fuck does Gore think he is?  This
black ass actually thinks he'll be an engineer one day."  (Gore
Dep. II at 293).  Also, the plaintiff testified that Mr. Giarraputo
commented that Mr. Gore was "Just like a black, never where they
[sic] supposed to be when you tell them."  (Gore Dep. II at 282;
Gore Dep. I at 185).  He also claims that Mr. Giarraputo said that
he "was shit" when he first met him and that Mr. Gore was "moving

4

up the ladder." (Gore Dep. I at 185).

Lastly, Mr. Gore has described the humiliation resulting from to Mr. Giarraputo's comments. He has testified that his co-workers would often "giggle" when Mr. Giarraputo insulted him. (Gore Dep. II at 24-26, 285). As a result of Mr. Giarraputo's remarks, Mr. Gore has stated that he lost self esteem, felt physically sick, became depressed, was unable to function properly, and worried that he could only go "so far in the world" because he was black. (Gore Dep. II at 282-83).

Mr. Gore claims that he told Mr. Giarraputo to stop harassing him at least three times but that Mr. Giarraputo ignored him. (Gore Dep. I at 189-92; Gore Dep. II at 23-25). He then filed a discrimination complaint with the New York State Department of Transportation (the "DOT") alleging that Mr. Giarraputo had been making racially disparaging remarks to him during the period when he was working on the Route 231 project. (Letter from the DOT) dated April 5, 2002, attached as Exh. V to Fiorenzo Cert.; 2nd Am. Compl., ¶ 19; Mavis Dep. at 10-11, 13). Upon receiving notice of Mr. Gore's complaint to the DOT, Lori Cole Sohn, RBA's Human Resource Director, and Anthony Mavis, RBA's New York Office Director, visited the Route 231 project job site and conducted an investigation into Mr. Gore's allegations. (Deposition of Lori Cole Sohn ("Sohn Dep."), attached as Exh. F to Fiorenzo Cert. and as Exh. 6 to Edelson Aff., at 6, 8-9). Ms. Sohn and Mr. Mavis interviewed Mr. Gore and other RBA employees. (Sohn Dep. at 44-45). Mr. Gore told them that Mr. Giarraputo referred to him using

racial slurs and other degrading terms, beginning just after he started on the Route 231 project. (Gore Aff. at 1; Sohn Dep. at 30-32; Ms. Sohn's Investigation Notes, attached as Exh. 9 to Edelson Aff.). Mr. Mavis also asked Mr. Gore why he did not follow the proper complaint procedures outlined in the Employee Handbook and stated that the plaintiff should have complained internally to RBA before notifying the State. (Def. Rule 56.1 Statement, ¶ 33; Mavis Dep. at 12-13). Ms. Sohn and Mr. Mavis also interviewed Mr. Giarraputo. (Def. Rule 56.1 Statement, ¶ 32; Giarraputo Dep. at 31-32). Mr. Giarraputo admitted that he called Mr. Gore a "nigger" when speaking to Mr. Davila, but denied directly addressing Mr. Gore with this epithet. (Giarraputo Dep. at 33-34).

On April 16, 2002, Ms. Sohn issued a letter to Mr. Giarraputo reprimanding him for his inappropriate behavior. (Letter of Lori Cole Sohn dated April 16, 2002, attached as Exh. X to Fiorenzo Cert.; Giarraputo Dep. at 29-33). She also orally reprimanded Mr. Giarraputo and gave him a warning that if any further complaints were made alleging racial harrassment by Giarraputo, he would immediately be fired. (Def. Rule 56.1 Statement, ¶ 36; Sohn Dep. at 36). Also, Ms. Sohn sent a letter to Mr. Gore acknowledging Mr. Giarraputo's inappropriate behavior and advising him that Mr. Giarraputo had been reprimanded and that Mr. Gore should contact either Ms. Sohn or a senior RBA officer such as Mr. Mavis if the harrassment continued. (Letter of Lori Cole Sohn dated April 17, 2002, attached as Exh. W to Fiorenzo Cert.; Sohn Dep. at 28-29; Mavis Dep. at 31).

The plaintiff alleges that after the investigation and warning, Mr. Giarraputo's use of racial slurs, including "nigger," continued. (Gore Dep. II at 286-87). Also, the plaintiff asserts that Mr. Giarraputo's behavior grew worse in that he engaged in retaliatory and discriminatory acts. (Gore Dep. II at 286-88). First, Mr. Giarraputo denied Mr. Gore night work assignments and increased pay even though similarly situated white employees received these benefits. Next, Mr. Gore has testified that Mr. Giarraputo attempted to sabotage his performance by giving him incorrect instructions for inputting information in Inspection Reports ("IR's"), while Julio Amaya, another RBA employee, altered the reports, giving the appearance that Mr. Gore was making errors and was essentially incompetent. (Def. Rule 56.1 Statement, ¶ 40; Gore Dep. I at 203-04, 205-06). Finally, the plaintiff has testified that Mr. Giarraputo made comments to him that he had no use for him anymore and that he would "never work on the Island." (Gore Dep. II at 294).

Mr. Gore told Ms. Sohn at least one time after the April 17 letter that the harassment had not stopped. (Gore Dep. I at 201-03, 219-20). In response to Mr. Gore's complaints, a meeting was held on May 24, 2002 that included Mr. Gore, several DOT personnel, RBA field office personnel, and Syed Haider, the principal of Haider Engineering. (Letter of Lori Cole Sohn dated Sept. 28, 2002 ("9/28/02 Sohn Letter"), attached as Exh. Z to Fiorenzo Cert.; Def. Rule 56.1 Statement, ¶ 41; Mavis Dep. at 49-53). Neither Ms. Sohn nor Mr. Giarraputo was present at the meeting. (Gore Dep. I at

303-04; Mavis Dep. at 54).

The plaintiff characterizes the meeting as a farce, the purpose of which was only to intimidate him. At that meeting, Mr. Mavis told Mr. Gore that there was no sabotaging of reports and that it was standard procedure for the office engineer to review and revise inspection reports prepared by inspectors. (Def. Rule 56.1 Statement, ¶ 42; Mavis Dep. at 49-53). Also, other employees at the meeting voiced complaints about Mr. Gore. (Gore Dep. I at 304-09). The plaintiff told Mr. Mavis at that meeting that Mr. Giarraputo was continuing to degrade him and call him racist names including "nigger" (Gore Dep. II at 287-88), but Mr. Mavis responded that name-calling was normal on a construction site. (Gore Dep. I at 307-09). Also, Mr. Gore alleges that Mr. Mavis told him that he was upset at Mr. Gore for filing the discrimination complaint with the State. (Gore Dep. I at 308). Finally, Mr. Gore alleges that Mr. Mavis attempted to persuade Mr. Gore to leave the job so "all [his grievance issues] could be squashed," but Mr. Gore refused. (Gore Dep. I at 307). The defendant claims that Mr. Mavis and Mr. Haider offered to transfer Mr. Gore, but Mr. Gore stated that he wanted to stay on the Route 231 project. (Haider Dep. at 28; 9/28/02 Sohn Letter). After the meeting, Mr. Giarraputo continued to serve as the plaintiff's supervisor. (Giarraputo Dep. at 57; 9/28/02 Sohn Letter; Gore Aff. at 2).

Mr. Gore then filed a discrimination complaint with the United States Equal Employment Opportunity Commission (the "EEOC")

regarding Mr. Giarraputo's conduct.  (EEOC Charge of Discrimination of Charles Gore dated June 6, 2002, attached as Exh. AA to Fiorenzo Cert.; Gore Dep. I at 290-92).  He wrote a letter to Rodney Plummer, an EEOC investigator, detailing the acts of discrimination and retaliation and speculating that he was being "blackballed" from employment with other engineering firms.  (Letter of Charles Gore dated July 7, 2002, attached as Exh. BB to Fiorenzo Cert.). In response to the EEOC's request, Ms. Sohn wrote a letter to Mr. Plummer explaining the history of the claim, concluding that Mr. Giarraputo had acted inappropriately, and contending that both the DOT and RBA considered the issue resolved.  (9/28/02 Sohn Letter; Def. Rule 56.1 Statement, ¶ 51).

The plaintiff claims that in late 2002, he was transferred from the Route 231 project "to a contract in New York City [the "Queens project"], before the Long Island contract's completion." (2nd Am. Compl., ¶ 308; Brief of Defendant, RBA Group, In Support of its Motion for Summary Judgment ("Def. Memo."), at 18 n.1).  The defendant claims that Haider laid off Mr. Gore because the State had run out of funding and that RBA rehired him on March 24, 2003. (Def.'s Rule 56.1 Statement, ¶¶ 53-55; Mavis Dep. at 57-58; Gore Dep. II at 290; Gore Dep. I at 261).  Mr. Gore worked under the supervision of Moshen Ghajari and does not claim that he experienced any racial hostility at that time.  (2nd Am. Compl., ¶ 32).  Although he was a Level III Engineer, Mr. Gore performed Level I inspection duties on the Queens project.  (2nd Am. Compl., ¶ 31).

In August 2003, the EEOC issued a Right to Sue Letter and provided a letter to Mr. Gore stating that it did not find sufficient evidence to continue the investigation. (Letter of EEOC dated Aug. 26, 2003, attached as Exh. EE to Fiorenzo Cert.; Def. Rule 56.1 Statement, ¶ 52). The plaintiff filed his first complaint in this Court on November 20, 2003. (2nd Am. Compl., ¶ 13). Shortly thereafter, RBA terminated him. (Gore Dep. II at 113-14).

Discussion

    A.  Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995); Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the movant meets that burden, the non-moving party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of a material fact, the court must resolve all ambiguities and draw

all factual inferences in favor of the non-moving party.  Anderson,
477 U.S. at 255; Vann v. City of New York, 72 F.3d 1040, 1048-49
(2d Cir. 1995).

Furthermore, special caution should be exercised in granting
summary judgment in employment discrimination cases where evidence
"directly supporting a claim of intentional discrimination [is]
rarely, if ever, found among an employer's corporate papers" and
therefore "affidavits and depositions must be carefully scrutinized
for circumstantial proof which, if believed, would show
discrimination." Gallo v. Prudential Services, Ltd., 22 F.3d 1219,
1224 (2d Cir. 1994).

B.  Employer Liability

RBA moves to dismiss the plaintiff's Title VII claims on the
ground that Mr. Gore was not its employee when the alleged
harassment occurred.  (Def. Memo. at 3-11).  In order to maintain
an action under Title VII, an employer-employee relationship must
have existed between the parties.  See Kern v. City of Rochester,
93 F.3d 38, 45 (2d Cir. 1996).  Under Title VII, the term
'employer' is "sufficiently broad to encompass any party who
significantly affects access of any individual to employment
opportunities, regardless of whether that party may technically be
described as an 'employer' of an aggrieved individual as that term
has generally been defined at common law."  Spirt v. Teachers
Insurance and Annuity Association, 691 F.2d 1054, 1063 (2d Cir.
1982), vacated on other grounds, 463 U.S. 1223 (1983); see Nelson
v. Beechwood Organization, No. 03 Civ. 4441, 2004 WL 2978278, at *5

11

(S.D.N.Y. Dec. 21, 2004); Laurin v. Pokoik, No. 02 Civ. 1938, 2004 WL 513999, at *4 (S.D.N.Y. March 15, 2004)) ("The term 'employer' has been construed liberally under Title VII, and does not require a direct employer/employee relationship."); Lans v. Kiska Construction Corp., No. 96 Civ. 4114, 1997 WL 313162, at *4 (S.D.N.Y. April 18, 1997)(in assessing whether a defendant is an "employer" within the meaning of Title VII, "particular emphasis is placed on a defendant's right to control the manner and means by which work is accomplished") (quoting Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir. 1993)).

The plaintiff claims that RBA was a joint employer with Haider during the time of the alleged harassment. "[A] joint employer relationship may be found to exist where there is sufficient evidence that [one entity] had immediate control over the other company's employees" and that the two companies shared responsibilities such as "commonality of hiring, firing, discipline, pay, insurance, records, and supervision[.]" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 89 (2d Cir. 2005)(quoting National Labor Relations Board v. Solid Waste Services, Inc., 38 F.3d 93, 94 (2d Cir. 1994) (per curiam) (alteration in the original); see Shehab v. New York State Department of Transportation, Bridge Inspection Unit, No. 03 Civ. 5730, 2005 WL 659146, at *3 (S.D.N.Y. March 10, 2005); Arculeo v. On-Site Sales & Marketing, LLC, 321 F. Supp. 2d 604, 608 (S.D.N.Y. 2004); Nelson, 2004 WL 2978278, at *4 ("'joint employer' doctrine assumes that two employers are in fact separate legal entities, but inquires whether they have 'chosen to

12

handle certain aspects of their employer-employee relationships jointly'") (quoting Clinton's Ditch Cooperative Co. v. National Labor Relations Board, 778 F.2d 132, 137 (2d Cir.1985)); Laurin, 2004 WL 513999, at *8.    Whether an employer "possessed sufficient control over [a worker] to qualify as a joint employer is essentially a factual issue." Clinton's Ditch Cooperative Co., 778 F.2d at 136  (quotation marks omitted); see Nelson, 2004 WL 2978278, at *4-5 (denying motion for judgment on the pleadings with respect to joint employment where plaintiff alleged "various ways in which [contractor] exercised dominion over [subcontractor's] employees").

Here, reasonable jurors could disagree whether the record conclusively shows RBA was a joint employer with Haider.  While RBA did not pay Mr. Gore, it had arranged for Haider to hire him for the Route 231 project and to put him on its payroll.  Thus, there is evidence in the record that Haider hired Mr. Gore to accommodate RBA's needs.  Moreovere, Mr. Giarraputo supervised Mr. Gore, gave him his assignments, set his schedule, had the authority to discipline him, and could decide in conjunction with Haider that Mr. Gore should be to terminated or transferred.  For these reasons, RBA is not entitled to summary judgment on the basis of the purported lack of an employment relationship with the plaintiff.

C.  Hostile Work Environment

The issue remains whether summary judgment is nevertheless appropriate with respect to the plaintiff's hostile work

13

environment claims.  Since identical standards apply to such claims
under Title VII, Section 1981, the New York State Human Rights Law,
and the New York City Administrative Code, this discussion will
analyze Mr. Gore's claims in light of Title VII jurisprudence.  See
Weinstock v. Columbia University, 224 F.3d 33, 42  n.1 (2d Cir.
2000); Franklin v. City of New York, No. 01 Civ. 10574, 2003 WL
21511932, *5 (S.D.N.Y. July 3, 2003).

    Mr. Gore's hostile work environment claims are based on racial
harassment.  Title VII states: "It shall be an unlawful employment
practice for an employer (1) to . . . discriminate against any
individual with respect to his compensation, terms, conditions, or
privileges of employment."   42 U.S.C. § 2000e-2(a)(1).    For
harassment to be actionable, the plaintiff must show: "(1) that the
workplace was permeated with discriminatory intimidation that was
sufficiently severe or pervasive to alter the conditions of [his]
work environment, and (2) that a specific basis exists for imputing
the conduct that created the hostile environment to the employer."
Petrosino v. Bell Atlantic, 385 F.3d 210, 220 (2d Cir. 2004)
(internal quotation marks omitted); see also Harris v. Forklift
Systems, Inc., 510 U.S. 17, 21 (1993); Cruz v. Coach Stores, Inc.,
202 F.3d 560, 570 (2d Cir. 2000); Stephany v. Brooklyn Hebrew
School for Special Children, 356 F. Supp. 2d 248, 262 (S.D.N.Y.
2005);.  "Proving such a claim involves showing both objective and
subjective elements: the misconduct shown must be severe or
pervasive enough to create an objectively hostile or abusive work
environment, and the victim must have subjectively perceived that

environment to be abusive."  Fairbrother v. Mornson, 412 F.3d 39, 48 (2d Cir. 2005) (internal quotation marks omitted).

The plaintiff has provided sufficient evidence for a jury to find that the harassment here met that standard.  He alleges that for the period of one and a half years that he worked on the Route 231 project, he endured racial slurs from Mr. Giarraputo, including being called a "nigger," a "piece of shit," and a "fat dumb black ass."  (Gore Dep. I at 84-87; Gore Dep. II 20-22, 280-82).  Even when Mr. Gore asked Mr. Giarraputo to stop insulting him, he maintains that Mr. Giarraputo ignored his requests and continued his hostile conduct.  After RBA's investigation of Mr. Gore's complaint of harassment, Mr. Giarraputo allegedly made retaliatory comments that Mr. Gore would "never work on the Island" and that "he had no use for [Mr. Gore] anymore."  (Gore Dep. II at 294). The plaintiff also claims that in retaliation for his having filed a discrimination charge with the DOT, Mr. Giarraputo undermined Mr. Gore's job performance by giving him false instructions.  In his deposition, Mr. Gore stated that Mr. Giarraputo made him feel physically sick and depressed.

Viewing the evidence in the light most favorable to the plaintiff, the record reveals circumstances are egregious enough to permit a reasonable juror to conclude that the conditions of Mr. Gore's employment were altered because of the racially hostile work environment on the Route 231 project.  Based on these facts, summary judgment is inappropriate.

However, the plaintiff must also show that a specific basis exists for imputing the objectionable conduct to the employer. Fairbrother, 412 F.3d at 48-49.  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  In determining whether an employer is vicariously liable in such a circumstance, "a court looks first to whether the supervisor's behavior 'culminated[d] in a tangible employment action' against the employee."  Fairbrother, 412 F.3d 39, 49 (quoting Petrosino, 385 F.3d at 225) (alteration in original).  A tangible employment action refers to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001) (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  "Whether an employment action constitutes a tangible employment action depends on whether it was a culmination of harassment, or if the plaintiff suffered a change in employment status for another reason.  Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 204 (N.D.N.Y. 2002).  If a plaintiff establishes that he suffered a tangible employment action, "the employer will, ipso facto, be vicariously liable[,]" Fairbrother, 412 F. 3d at 49, and will not be entitled to an affirmative defense.  Caridad v. Metro-North Commuter Rail Road,

16

191 F.3d 283, 294 (2d Cir. 1999); Bennett, 225 F. Supp. 2d at 204.

Yet, even where the plaintiff fails to make such a showing, "an

employer will still be liable for a hostile work environment

created by a supervisor unless the employer successfully

establishes an affirmative defense." Fairbrother, 412 F.3d at 49

(citing Petrosino, 385 F.3d at 225).

Resolving all factual disputes in favor of Mr. Gore, he could

be found to have suffered tangible employment actions including

being denied night assignments and increased pay on the Route 231

project and being transferred to the Queens project where he

performed duties below his level of certification and below the

level of responsibility of the duties he had performed previously.

Factual questions remain as to the true reasons for this treatment.

It could be inferred that these employment actions were a

culmination of the harassment inflicted by Mr. Giarraputo.  This is

supported by Mr. Davila's  statements in his affidavit that after

the investigation of his discrimination complaint, "Mr. Gore was

treated differently[,]" "nit-picked" by Mr. Giarraputo and Julio

Amaya on his IR's, and given duties inappropriate for a level III

inspector.  (Davila Aff. at 2).  In addition, there is evidence in

the record indicating that Mr. Giarraputo possessed the authority

necessary to carry out such tangible employment actions.  According

to Mr. Gore,  Mr. Giarraputo had the authority to assign him his

duties, to discipline him, to remove him from one project, and to

transfer him to another.  Although this power have may not have

been unilateral, a reasonable juror could find that Mr. Giarraputo

had the authority, at the very least, to recommend employment actions including assignments, demotions, and transfers, and that such recommendations would be followed. See Hill v. The Children's Village, 196 F. Supp. 2d 389, 396 (S.D.N.Y. 2002) (authority to recommend termination and alter schedule shows supervisory status sufficient to establish that supervisor was capable of carrying out a tangible employment action); Bennett, 225 F. Supp. 2d at 206.

Mr. Gore, then, has presented evidence that at least creates disputed issues of fact with respect to whether he suffered actionable harassment and whether that harassment is attributable to RBA on the basis of associated tangible employment actions. In these circumstances, it is unnecessary at this time to address the parties' further arguments on the issue of whether, if there were no tangible employment action, RBA would be entitled to judgment on its affirmative defense.

Conclusion

For the reasons stated above, I recommend that the defendant's motion for summary judgment be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, Room 920, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

18

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:   New York, New York
         August 29, 2005

Copies mailed this date to:

Christopher P. Edelson, Esq.
155 East 47th Street, #2E
New York, New York  10017

Joseph B. Fiorenzo, Esq.
Sokol, Behot & Fiorenzo
433 Hackensack Avenue
Hackensack, New Jersey  07601

Syed Haider
Haider Engineering, PC
755 Merrick Road
Baldwin, New York  11510

19